[Cite as *State v. Johnson*, 2020-Ohio-2742.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28426 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-4242 |
| | : | |
| DORIAN JOHNSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 1st day of May, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

ANDREA DEWAR OLADI, Atty. Reg. No. 0078868, 117 South Main Street, Suite 400, Dayton, Ohio 45422
     Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Dorian Johnson appeals from his conviction, following a no contest plea, of possession of heroin in violation of R.C. 2925.11(A), a felony of the fifth degree. We conclude that the trial court erred in overruling Johnson's motion to suppress, and we reverse the judgment of the trial court.

{¶ 2} Johnson was indicted on December 28, 2018, for possession of fentanyl, possession of heroin, and obstructing official business. Johnson pled not guilty on January 24, 2019, and he filed his motion to suppress on February 11, 2019. After a hearing, the trial court overruled the motion to suppress. Johnson then entered a plea agreement wherein he pled no contest to possession of heroin, and the other counts were dismissed. Johnson was found guilty and sentenced to community control sanctions for a period not to exceed five years.

{¶ 3} At the hearing on the suppression motion, Officer Zachary O'Diam testified for the State. He had been a patrol officer for the City of Dayton Police Department for six and a half years. O'Diam testified that, on October 29, 2018, just after 5:00 p.m., he was operating his cruiser, in uniform, with Officer Joshua Bowling as his partner, when they encountered a black Chrysler 300 while their cruiser was stopped at the light at South Gettysburg Avenue and Third Street. O'Diam testified that "[e]xactly a week prior," the same vehicle had fled from him and another officer near South Broadway during an attempted traffic stop. On October 29, 2018, O'Diam recognized the vehicle by its license plate, make, model, and color; the vehicle also had excessively tinted windows, which had been the basis for the attempted traffic stop the previous week. O'Diam further testified that, on October 29, 2018, Bowling advised him that "a heavyset black male" was in the passenger seat of the Chrysler "with short dreads," and a "tall skinny

black male" was in the driver's seat of the vehicle.

{¶ 4} O'Diam testified that, due "to the vehicle's propensity to flee" and their position, it was not safe for the officers to turn their cruiser around at the time, so they "relocated to the area" where the vehicle had been observed the previous week. They did not observe the vehicle there, so they proceeded west on Watson Street toward Danner Avenue. O'Diam testified that they observed the Chrysler "parked against the east curb" on Danner Avenue; 15 to 20 minutes had elapsed between their initial observation of the vehicle and encountering it on Danner Avenue. O'Diam testified that, as he pulled up, he activated his overhead lights to initiate a traffic stop "[b]ecause of the illegal dark window tint, and also, we still hadn't solved the failure to comply [from the prior week] as well."

{¶ 5} O'Diam testified that, when he observed the vehicle on Danner, a passenger was "moving in the front passenger seat," and there was no driver in the vehicle. Bowling directed his attention to Johnson on the porch of a home on Danner Avenue, which was on the opposite side of the street from the Chrysler. O'Diam exited his cruiser and began to approach Johnson to "detain him for investigation of the vehicle." As he did so, O'Diam observed that Johnson was fumbling with his keys, looking around the northeast corner of the house, looking at O'Diam, and looking at his keys, seemingly "indecisive." Johnson made eye contact with O'Diam, and O'Diam stated, "hey, how's it going." Johnson continued to look around and "seemed to be not sure what he was going to do." O'Diam testified that Johnson was 15-20 feet from him at that point. O'Diam testified that Johnson's conduct concerned him, "especially with the vehicle's propensity to flee" and Johnson's actions, which O'Diam "correlated with somebody that [he had] typically dealt

with that would run."

{¶ 6} O'Diam testified that there was "a good gap" between Johnson and him at this point, such that O'Diam was worried that Johnson would either enter the house or run, thus preventing the issuance of a citation. O'Diam testified that Johnson "started to put the keys in the door" while there was still "a pretty good distance" between them, so O'Diam tried to get Johnson "off subject" or distract him by asked him if he had seen a kid in the area. O'Diam testified that he "wanted to grab ahold of him so he couldn't flee, and explained to him the reason for the stop." According to O'Diam, Johnson matched Officer Bowling's description of the driver, and "with the positioning of the car and where he was, it was obvious that * * * he was the driver of the vehicle." O'Diam testified that he was concerned that Johnson "was going to be able to make that corner" of the house before O'Diam "was able to get a view of him" and that Johnson "was going to get out of sight and out of range of being able to detain him."

{¶ 7} The following exchange occurred:

[Prosecutor] Q. * * * Why * * * did you want to grab ahold of him and detain him from the traffic stop?

A. It wasn't a typical traffic stop where somebody's going to comply, with the vehicle already failing to comply - - if they're going to flee in a car, they're going to flee on foot typically.

Q. * * * And then did you ultimately, as you put it, grab ahold of him?

A. Yes.

Q. * * * And what did you grab ahold of?

A. The back of his waistband.

* * *

Q.   * * * [W]hat happened at that point in time?

A.   When I grabbed ahold of him - - from the moment we had eye contact and I think I originally asked him - - after I said how's it going, I asked him if he had any identification on him, it was apparent he knew I was trying to speak with him.   But when I grabbed ahold of him, he just started flailing his arms.   Said, what are you doing; I said, stop.   I continued to try to say, stop, so I could explain to him.   But he kept - - continued to flail.   Eventually actually broke my grasp and was able to make it towards the east end of this porch here, and almost got down the porch before I was able to grab ahold - - back ahold of his jacket; continued to tell him to stop.   He continued screaming, what are you doing, what are you doing.   I continued to try to just grab ahold of him before I could explain to him and everything. Eventually got a better hold of him.   Was able to force him to the left side of this doorway here up against the wall.   I was able to control his movements better, and at that point I explained to him this is just a traffic stop, you know, I'm stopping you for driving this vehicle.   I need you to put your hands behind your back.   And, at that point he began to comply.

{¶ 8} O'Diam testified that Johnson initially stated that he did not have any identification.   He testified that, when Johnson broke away, Johnson took "three steps, all the way to the [north] edge of the porch there. * * *. It wasn't just normal three steps; he was struggling to get all steps away from me before I was able to grab back ahold of him."   When O'Diam grabbed Johnson the second time, O'Diam "was able to pull his

jacket back and then grab ahold of his whole waistband and * * * basically pick up his body weight and detain him then." O'Diam continued to tell Johnson to stop.

{¶ 9} O'Diam testified that he placed Johnson in handcuffs after the struggle and that Johnson was under arrest for obstruction, because when told to stop, Johnson "was able to actually push his arm back off of me to gain distance between he and I, and continued to try to run away." O'Diam testified that Johnson's actions impeded O'Diam's ability to investigate the window tint violation and the previous failure to comply.

{¶ 10} O'Diam stated that as Officer Bowling began to approach, Johnson, "continued to act disorderly," notwithstanding that he was in handcuffs; Johnson "was able to get his keys from behind his back and throw them to * * * a teenage kid," saying "here, take my keys." O'Diam testified that Johnson was also "screaming," and two kids from down the street ran toward the scene because of the disturbance Johnson was causing, which put the kids in danger; Bowling ordered the kids to get back. As the responding crews were arriving, they saw the kids running away and thought they were part of the disturbance, and they were detained again by some of the responding officers. Johnson was placed in the cruiser, at which point he settled down.

{¶ 11} O'Diam testified that he conducted a search incident to arrest next to the cruiser:

I began to pat him down for weapons, and as I'm patting him down, I asked him if it was okay if I could check to see if he had any guns, knives, or drugs on him. He stated, yeah, and said, you already are, meaning my pat down. He thought that was a search. So at that point I was still going to search him incident to arrest, and checked his left front pocket and

recovered a small clear plastic baggie of what appeared to be crack cocaine.

**{¶ 12}** When asked why he requested Johnson's consent to conduct the pat down he intended to perform, O'Diam responded, "I just always do. It's just kind of - - you get more compliance * * * if they kind of think that they're in charge." Once in the cruiser with Johnson, O'Diam "eventually" got Johnson's identification; he then read Johnson his Miranda warnings from a card provided by the prosecutor's office and began to question him about this incident and the previous failure to comply. O'Diam testified that Johnson indicated his understanding of his rights.

**{¶ 13}** On cross-examination, O'Diam testified that when he first observed the Chrysler on the prior occasion on October 22, 2018, he ran the plates and learned that it was registered to Rachel Heard; although he also obtained Heard's address, he never contacted her. O'Diam stated that he did not know if Heard was driving the vehicle when it was initially observed. On October 29, 2018, when O'Diam activated his lights next to the parked Chrysler, his cruiser camera automatically started. O'Diam acknowledged that his police report stated that the driver of the car was rushing to unlock the front door of the Danner Avenue address.

**{¶ 14}** The video from the cruiser was played for the jury. The following exchange occurred after the video depicted O'Diam's cruiser turning onto Danner:

[Defense Counsel] Q. * * * Now at this point is when you've stopped your cruiser, correct?

A.  Yes, ma'am.

Q.  And you parked alongside the Chrysler?

A.   Yes.

Q. * * * This is when you say, what's up man, what's up man, got any ID on you - - that's your first interaction with him, correct?

A.   Yes, ma'am.

Q. * * * Did you hear him say yes?

A.   I couldn't hear him.

Q. * * * Well, if you listen very closely, on the video he actually says yes.   And then you say okay.

So at this point, Mr. Johnson's asking you what's the problem. * * * Correct?

A.   Yes, ma'am.

Q. * * * Let me play just a little more of this.   So after you asked him whether he had ID - - which you indicated he said he didn't but we hear on the video he says he does - - you then use the pretext of a missing child to get close enough to grab him, correct?

A. I cannot say that you hear him say yes; I can't hear him.

{¶ 15} O'Diam acknowledged that Johnson was not rude or hostile before O'Diam grabbed him, and that he (O'Diam) did not identify himself.   The following exchange occurred:

[Defense Counsel] Q.   And you grab his arm?

A.   His waistband.

Q. * * * And he's trying to pull away.   That's what that's all about.   You're grabbing him, he's pulling away, saying, what's the problem, what's the problem,

what's the problem. And you're grabbing him as he's trying to pull away?

A. Yes.

Q. * * * Ultimately, you then force his body against the wall of the house?

A. Correct.

* * *

A. He put his hands behind his back after I - -

Q. Okay.

A. - - requested him to.

Q. * * * And it's not until then that you explain the reason for the stop?

A. Yes, ma'am.

{¶ 16} O'Diam testified that he did not find any weapons on Johnson in the course of the pat down.

{¶ 17} O'Diam acknowledged that, while at the intersection of Gettysburg Avenue and Third Street, he observed the Chrysler "as a pass" as it was going in the opposite direction, and that he did not observe the license plate, although Bowling did. O'Diam testified that the traffic at Gettysburg and Third Street was busy, and he did not attempt a traffic stop at that time for the safety of other motorists. He acknowledged that when he first observed the vehicle the week before, he did not obtain any descriptors for the occupants of the vehicle such as facial features, clothing, or age.

{¶ 18} On re-direct examination, O'Diam testified that he first observed Johnson as Johnson was "making his way up the steps of the front porch" of the Danner Avenue address. O'Diam described Johnson's behavior as "very suspicious" at the time. O'Diam stated that Johnson "obviously observed our overhead lights * * * and seemed to be

indecisive if he was going to go in the house or go around the corner." O'Diam stated that when he asked Johnson if he had identification, he did not hear his response. When asked why he said "okay" as reflected on the video, O'Diam responded that it was to "ease the confrontation" so Johnson would not go into the house, which would have been "a more dangerous situation." O'Diam testified that, although Johnson never left the porch, he was "continually trying to get away," and O'Diam felt it was necessary to grab Johnson because, based upon O'Diam's past experience, Johnson "was giving every indication of somebody [he'd] had run before[,] * * * just kept looking around, back and forth, kind of sizing me up, sizing the distance of which way he was going to go." When asked, "is that reflected on the video or the body mic at all," O'Diam responded, "No." When asked why he did not immediately inform Johnson of the reason for the stop, O'Diam testified that he "wanted to get hands on him first." O'Diam stated that, "typically," when a vehicle has fled, "more than likely they're armed. When we do recover these cars from fleeing, typically they're either armed or have drugs with them, and that was my biggest worry."

{¶ 19} When asked how Bowling indicated his observation of Johnson at the house on Danner Avenue, O'Diam responded that Bowling had said, "there he is," which O'Diam understood to mean the driver. O'Diam estimated that the intersection where the car was first observed on October 29 was about three to four miles from the Danner Avenue residence. On recross-examination, O'Diam acknowledged that he had no "direct evidence" placing Johnson in the vehicle.

{¶ 20} Officer Bowling, who had also been employed as a City of Dayton police officer for six and half years, testified that on October 29, 2018, he was on routine patrol

with O'Diam when he observed the black Chrysler while facing northbound on Gettysburg at West Third Street. The Chrysler turned from Third Street to head south on Gettysburg and passed the officers' cruiser. Bowling observed "dark window tint" on the front driver window, which appeared to be in violation of the law. He testified that he "got a general description of the driver and the passenger in the vehicle" when it passed the cruiser, because the windshield of the vehicle was not tinted and the two vehicles were "head on" at one point. Bowling testified that he observed through the windshield a heavy-set black male with "small dreads" as the passenger, and the driver "was skinnier, seemed to be taller, just a thinner, athletic build." Bowling testified that he ran the license plate through the cruiser computer and found that there was a recent field interview card from prior contact with this particular vehicle that indicated the vehicle was "known to flee from police officers."

{¶ 21} Bowling testified that he next observed the vehicle on the east curb on Danner Avenue; from the rear of the vehicle, he could not tell if anyone was actually in the car. As O'Diam initiated the stop by means of the overhead lights, Bowling observed an individual on the front porch of a residence on Danner; the individual "looked the same as the person [Bowling] saw driving the car" when they had passed it earlier, with the same physical features. Bowling testified that he pointed and said to O'Diam, "there's the driver up there." Bowling testified that the male he observed "was standing on the front porch, and as he saw me, he started looking back and then * * * he was * * * frantically trying to * * * get into the door, put a key in the door, or he was just moving his hands a lot towards the doorknob." Bowling stated that the suspect's behavior was "suspicious" and worried him, given that the car was known to flee from the police, and the man was

in the vicinity of that car. Bowling testified that he was concerned that "he possibly could have weapons or something he was trying to get rid of, trying to get into the house, run from us * * *."

{¶ 22} Bowling was on the passenger side of the cruiser, so he approached the Chrysler and determined that there was still someone in the passenger side of the vehicle. Bowling "deal[t] with" the passenger while O'Diam approached the other man on the porch. When asked if he observed O'Diam's interaction with Johnson, Bowling responded, "I could hear it more than see it, because I was trying not to take my eyes off of the passenger," but Bowling did observe that O'Diam was "trying to * * * control the suspect's arms at this point." Bowling radioed for backup. Bowling testified that a juvenile in the area "ran up to the residence where the suspect was standing on the porch, and the suspect threw the keys to the juvenile."

{¶ 23} On cross-examination, Bowling confirmed that he did not observe the Chrysler on October 22, 2019, the date of the alleged failure to comply, and he did not recognize Johnson from any prior interactions. Bowling stated that he did not share with O'Diam the specific identifying characteristics of the vehicle's occupants that he observed as the vehicle passed the cruiser.

{¶ 24} Johnson testified that he was 33 years old, married, and a father of four children; he worked for his "family body shop" and for Express Employment. Johnson testified that on October 29, 2018, he was at his home on Latham Street, doing yard work. His brother-in-law, who lived in Jefferson Township, called and asked Johnson for a ride, because Johnson had access to his mom's car. Johnson testified that his mother's car was parked at his grandmother's house, and that his father had put brakes on it, which is

why the keys and car were there. When asked who had control of the vehicle at that time, Johnson responded, "it was a spare car, so no one really was driving it." Johnson testified that his wife normally drove him around or he would catch a city bus if he had to.

**{¶ 25}** Johnson testified that he received a second phone call from his other brother-in-law, who asked to "ride along" with him that day. Johnson stated that the second brother-in-law resided three blocks west of him; Johnson picked him up on Weaver Street. Johnson testified that his wife and children lived at the intersection of Miami Chapel Road and Danner Avenue, and that while en route to Jefferson Township, he saw his kids outside in the area; he "pulled over to the curb." According to Johnson, his children were "a distance away from the house," which caught his attention, because he did not remember the children asking him for permission to leave; he wanted to see why they were out. Johnson testified that he exited his vehicle, walked to the door, grabbed the doorknob, and found that the door was locked, which was unusual. He stated that he observed his youngest son "down by the store"; his son approached him, entered the yard, and asked if Johnson had seen his basketball. Johnson stated that he had observed the basketball "down by the gate," grabbed the basketball, and asked his son to get the keys out the car for him so he could get into the house. He testified that his son retrieved the keys and handed them to Johnson in exchange for the basketball; his son then walked out the gate.

**{¶ 26}** According to Johnson, he unlocked the door to the home and, as he was about to open the door, he heard a car door shut behind him; he turned around and observed "police with overhead lights on." Johnson stated that, when he saw O'Diam approaching, his "first instinct" was to walk in the house, but then he thought that doing

so would make it seem like he had "something to hide." Johnson testified that, since he could produce identification, he could "see what's going on," and there was no reason for him to run or go into the house. Johnson testified that, at the time, there was enough distance between him and O'Diam that he could have entered the home or fled. Johnson testified that O'Diam began speaking as soon as he (O'Diam) came through the gate, and O'Diam asked for Johnson's identification when he was five to seven feet away.. Johnson testified that he "produced [his] whole entire wallet," which included his identification, but when he attempted to hand the wallet to O'Diam, O'Diam reached for Johnson's arm, so Johnson reached for his waistband. Johnson testified that he repeatedly asked, "what's the problem," and that when the two men were about three feet apart, O'Diam hit him "with the little jib (phonetic) about the kid" and "attempted to grab" him.

{¶ 27} Johnson testified, "if you can hear me in the video - - I told him you're not going to slam me. Because he would not tell me what was going on." Johnson stated that O'Diam did not identify himself or advise him why he was being detained. Johnson denied hitting or pushing O'Diam. Johnson stated that he yelled to his youngest son to come get his keys, and that when his oldest son and a friend, who had been "down there by the store" approached the scene, Johnson yelled to them to get their mom "[b]ecause of the aggressiveness of the Dayton Police." He testified that his concern was that the police "might actually hurt the kids because the kids were running out of fear * * * not out of being a suspect for a crime." Johnson testified that he "fully cooperated" after he was restrained.

{¶ 28} On cross-examination, Johnson testified that he lived with his

grandmother, Rachel Heard. He stated that, on Danner Avenue, he proceeded to the residence before approaching his children, who were a block away from the home, because he believed there was "at least one more kid in the house." Johnson testified that, while O'Diam was telling him to stop in the course of the struggle, Johnson was "[j]ust keeping him from throwing me on the ground." Johnson testified that, after he broke free of O'Diam's grasp, he "[s]tood right there with him. We walked off the porch together. And I was not in handcuffs. * * * I complied with him."

{¶ 29} On redirect examination, Johnson testified that he never fled from the police in the vehicle. Johnson testified that, in the course of the struggle, he believed O'Diam was "trying to get [him] on the ground," and Johnson struggled with him to avoid getting "slammed on the concrete."

{¶ 30} In its decision overruling Johnson's motion to suppress, the trial court made the following findings of fact regarding the officers' observation of the vehicle and subsequent actions:

> * * * The officers noticed that the vehicle contained what they believed to be illegal window tint on the side windows. The officers noted the license plate number and the make and model of the car.
>
> Officers O'Diam and Bowling saw a heavy set black male with dread locks and a skinny black male as occupants of the black Chrysler 300.
>
> * * *
>
> By use of the license plate number and law enforcement information, the O'Diam-Bowling crew were able to obtain the owner's name and the registration information. Based on this information, the O'Diam-Bowling

crew received a report by virtue of a "field investigation card" that a black Chrysler had failed to comply with an order or signal of an officer, on or about October 22, 2018, possibly in the area of Weaver Street.

* * * At approximately 5:45 p.m., they came upon the black Chrysler 300 on the east curb of Danner Avenue. * * *

* * * The officers were able to observe the license plate and it was the same as they had noted at Third and South Gettysburg. The officers talked to one another and noticed that the person they *felt* was the driver from Third and Gettysburg was now going to, or was at the residence located * * * [on] Danner Avenue.

Officer O'Diam saw the driver on the porch of that house. Officer O'Diam noted the driver was fumbling with some keys in his hands. Shortly thereafter, the officers saw the driver place a key in the door.

Officer O'Diam opened the gate and went up the walkway at [the house on] Danner Avenue. His intent was to question the "driver," who was later identified as Defendant, Dorian Johnson. Officer O'Diam intended to investigate the window tint violation and the failure to comply issue with Defendant.

Officer O'Diam noted that the Defendant was on the porch and was looking to the north and the south. * * * When located on the porch, a person would be looking to the east as [the house in question] is on the west side of the street. There is another small house immediately adjacent * * * on the north side and a similar house located immediately to the south * * *.

Officer O'Diam was concerned that Defendant would flee. In order to reduce the chance of flight and to facilitate getting closer, Officer O'Diam began to speak to Defendant. Officer O'Diam did not initially say to Defendant that he was there to talk to him about the window tint violation and the failure to comply matter. However, Officer O'Diam was in uniform and the cruiser was in close proximity with overhead lights activated. Officer Bowling had left the cruiser and was engaged in an encounter with the passenger of the black Chrysler 300.

Officer O'Diam said, "What's up?" "Do you have an ID?" The Defendant initially said, "No," but almost immediately changed his answer to "yes." In order to engage with Defendant and continue to get closer, Officer O'Diam asked Defendant if he had seen a young man. Officer O'Diam said, "Have you seen a kid around here?" Defendant, in fact, continued to look around. Defendant did eventually produce his wallet with an I.D.

Officer O'Diam grabbed the Defendant at the waist area. He asked again for the ID. The Defendant continued to move and said in rapid fashion a number of times, "What's the problem? What's the problem? What's the problem?"

Officer O'Diam gained a second hold of Defendant and put him against the wall of the house. At that time, the Defendant began to comply with Officer O'Diam's orders. Defendant was placed in handcuffs and apparently produced an ID.

Defendant threw the keys he had to the young man that had been running down Danner Avenue from north to south to the house. * * *

Officer O'Diam felt that Defendant had obstructed official business. He felt Defendant had impeded his ability to investigate the window tint issue and the failure to comply matter. So he announced an arrest of Defendant and engaged in a pat-down for weapons. He found no weapons. He did then indicate the search was incident to a lawful arrest and an ID was produced. At that point, Officer O'Diam advised Defendant of the reason for the stop. This reason was not only the arrest basis for obstruction, but also the issues of window tint and failure to comply.

* * *

After Defendant had been handcuffed, he was not rude. He was not hostile. Generally, he was not particularly belligerent with the officer during the entire encounter, except he moved his body and arms after Officer O'Diam's initial grab and stated, "What's the problem?"

(Emphasis added.)

{¶ 31} The court further discussed Officer Bowling's involvement, noting that when Bowling observed the Chrysler at Third Street and Gettysburg Avenue, he noticed that the window tint appeared excessive on the side windows, but the front windshield was not tinted, so Bowling was able to see the occupants of the Chrysler "as they made the turn in front of the police cruiser." The court observed that when Bowling observed the Chrysler on Danner Avenue, he "saw the apparent driver on the front porch of a residence trying to get into the house." The court noted that Bowling had not been personally

involved in the encounter with the black Chrysler 300 the previous week; what he knew about that incident came only from his investigation of police databases, which revealed the field interview card. Bowling did not know the age, weight, or facial features of the person(s) involved in the October 22 incident. The court found that Bowling was able to "generally identify" the occupants of the car at Third and Gettysburg and recognize that one of them "appeared to be the same gentlemen on Danner Avenue."

{¶ 32} Regarding Johnson, the court found that he was at the house on Danner Avenue on October 29, 2018, had possession of some keys, and was attempting to enter the house when police came upon the scene. The court found that Johnson "did drive the black Chrysler" on that date just prior to his encounter with Officer O'Diam on the porch, and Johnson recognized that there was a police officer there driving a marked cruiser. The court found that Johnson "believed the officers were effectuating a traffic stop when they activated the overhead lights when the cruiser was adjacent to the black Chrysler 300 parked on the east curb."

{¶ 33} The trial court issued the following conclusions of law:

* * *

In the case at bar, Officers O'Diam and Bowling had witnessed what they suspected to be a traffic violation or a motor vehicle equipment violation, the window tint issue. Accordingly, they had reasonable, articulable suspicion to justify a traffic stop of the black Chrysler 300. The officers came upon the black Chrysler 300 on Danner Avenue. When the officers saw the vehicle with its window tint at Third and Gettysburg, they noted the license plate number on the car. They also noted general

descriptors of the occupants.   Ten to fifteen minutes later they saw the car with the license plate previously identified on the east curb of Danner Avenue.   They also saw in the car, or near the car, two individuals who matched the descriptions in a broad sense of the occupants they had previously seen in the car.   So there was reasonable and articulable suspicion justifying the traffic stop of the black Chrysler 300 on the east curb or Danner Avenue on October 29, 2018 at approximately 5:30 p.m.

The officers also, in their investigation with respect to the black Chrysler 300, received information that the operator of that vehicle had previously failed to comply with an order or signal of a police officer.   The officers had two matters to investigate when they came upon the black Chrysler 300 at * * * Danner Avenue on October 29, 2018.

* * *

* * * So Officer O'Diam could briefly stop and temporarily detain Defendant, the apparent driver of the black Chrysler, in order to investigate the window tint violation and the failure to comply. Officer O'Diam had observed a violation of the tint rules.   So he could stop Defendant to investigate the failure to comply violation that may have occurred in relation to this black Chrysler 300 on October 22, 2018.

**{¶ 34}** Regarding O'Diam's use of force, the trial court concluded as follows:

In this case, Officer O'Diam's act of taking hold of the waist of Defendant was reasonable under the attendant circumstances. Officer O'Diam was attempting to investigate the tint and failure to comply issues.

Defendant had gone on to the porch of the house and was looking all around as if to flee. Officer O'Diam has experience and based on Defendant's actions he felt Defendant was considering fleeing. Defendant had left the black Chrysler that the officers had seen shortly before and was attempting to enter a house. He had keys available to him and he was in the process of utilizing the keys to get in the front door.

Defendant could certainly observe Officer O'Diam's uniform and could see the marked cruiser in the street. The overhead lights of the cruiser had been activated. Officer O'Diam saw Defendant looking about. The officers had information which led them to suspect flight because the black Chrysler had apparently fled from police just one week before. Admittedly, the evidence did not establish that Defendant was the driver of the black Chrysler on October 22, 2018, but it is his mother's car and he appears to have access to it.

At that point, Defendant did resist. He moved his hands and arms and twisted his body so as to break free from Officer's O'Diam's grip. He was asserting rather loudly, "What's the problem?" Then the officer grabbed him again and placed him in handcuffs. Officer O'Diam felt that the Defendant was impeding his ability to investigate the two issues.

It is indicated that handcuffing is permitted and Defendant's physical resistance indicates that the individual may be dangerous. Further, the handcuffing did appear to be necessary to effectuate the purpose of the stop. It is, under these circumstances, the least intrusive means available

to verify the officer's suspicions in a short period of time. There was no indication at that time that it would be other than temporary.

This case is somewhat similar to [*State v. Thompson*, 2d Dist. Montgomery No. 26139, 2014-Ohio-4244]. In *Thompson*, the defendant, after being approached by the officer, loudly and excitedly exclaimed that he had done nothing wrong. The defendant moved his arms about and was totally uncooperative. The officer tried to escort the defendant from a store by the elbow, at which point the defendant said, "I'm not going anywhere." When the officer tried a second time to escort the defendant out of the store by his elbow, the defendant pulled away from him. The officer in *Thompson* drew a TASER in order to gain compliance. The Court of Appeals found this detention lawful.

In the case at bar, the Defendant moved his arms and his body so as to break the officer's grasp. He shouts three times, "What's the problem?" He clearly at all times is indicating that he feels he has done nothing wrong and is not going to cooperate.

(Footnotes omitted.)

{¶ 35} Regarding obstructing official business, the court determined as follows:

* * * In this case, Defendant, without privilege to do so, broke away from Officer O'Diam by moving his arms and body. He continued to move his arms and body until Officer O'Diam could grab him again. Officer O'Diam was in the process of detaining Defendant so he could be asked about two legal violations. Officer O'Diam felt the need to physically secure

or seize Defendant because Defendant gave indicators that flight was possible. Further, the circumstance of a prior failure to comply was in the knowledge of Officer O'Diam. Defendant engaged in an act which hampered Officer O'Diam in being able to talk with Defendant about the possible violations.

* * * Defendant acted so as to break the hold of Officer O'Diam. Defendant did not want to be detained so he flailed his arms, moved his body, and yelled out.

Because no one can know the mind of another, Defendant's intent is not discernible through objective proof. Rather Defendant's intent in acting must be determined from the manner in which the act is done, the means used, and all other facts and circumstances in evidence. Examination of Defendant's behavior and all facts and circumstances here indicate that Defendant wanted to be free from interaction with Officer O'Diam. That result, and Defendant's action to accomplish it, hampered Officer O'Diam. Accordingly, it is reasonable to find that Defendant was obstructing official business.

{¶ 36} Regarding Johnson's suggestion that O'Diam and Bowling created an exigency in approaching him, the trial court determined as follows, citing *State v. Sims*, 127 Ohio App.3d 603, 713 N.E.2d 513 (2d Dist.1998):

* * * The court is of the view that the case at bar is distinguishable from *Sims*. The officers [in Johnson's case] did have reasonable, articulable suspicion to believe that criminal activity was afoot, that is the window tint

matter. The officers [had] viewed the window tint situation only ten to fifteen minutes before. They verified it was the same vehicle because it had the license plate number that they previously saw and also "ran" through police databases. They verified that the men they saw on Danner were very probably the same men they saw in the car at Third and Gettysburg.

The suspicion for the failure to comply is not quite as strong. However, it is such that the officers should be able to investigate and detain, if necessary. An [field interview] card had identified this black Chrysler 300 as being involved in the prior incident, only a week before on Weaver Street. Weaver Street is in the same general area of west Dayton as Third and Gettysburg. The information was obtained by the officers when utilizing the descriptions of the car and license plate. Thus, unlike in *Sims* * * *, the black Chrysler 300 is connected to some criminal activity.

In *Sims*, the defendants were occupants and did nothing of a suspicious or improper nature. They are detained after the warrantless entry. In this case, Defendant vacates the Chrysler and goes to the porch of the residence. The Defendant appears to be considering flight. The Defendant moves his body and arms when Officer O'Diam grabs him. The Defendant fails to comply with the officer's commands for a short period of time. The officer is in uniform and is in immediate proximity to a marked cruiser with activated overhead lights. Under these circumstances, it is reasonable to conclude that the officers did not create an exigency that

Defendant appropriately reacted to, such that he had no purpose to obstruct. The circumstances do not support that conclusion.

The circumstances support a conclusion that officers were investigating with reasonable and articulable suspicion two violations of law. They witnessed the tint violation and had, through investigation, grounds to suspect failure to comply. They were going to discuss these matters with Defendant. The Defendant did not cooperate. Obstructing official business occurred.

* * * Officer O'Diam engaged in a search of the Defendant incident to the lawful arrest for obstructing official business. During that search, the officer found the baggie in the Defendant's left, front pocket. The baggie appeared to contain crack cocaine.

{¶ 37} Based on these conclusions, the trial court denied Johnson's motion to suppress.

{¶ 38} On April 13, 2019, Johnson filed a request for intervention in lieu of conviction ("ILC"). On May 6, 2019, the court orally overruled this request, and Johnson entered his plea of no contest. The trial court found him guilty and sentenced him to community control sanctions for a period not to exceed five years.

{¶ 39} Johnson asserts the following assignment of error on appeal:

THE LOWER COURT ERRED WHEN IT DENIED MR. JOHNSON'S MOTION TO SUPPRESS AND FOUND THAT THE USE OF FORCE IN THE FORM OF GRABBING AND HANDCUFFING WAS PERMISSIBLE UNDER THE CIRCUMSTANCES AND THAT MR. JOHNSON

OBSTRUCTED OFFICIAL BUSINESS.

{¶ 40} Johnson argues that he went to his family's residence in broad daylight to check on his kids and that there was no evidence that this was a dangerous neighborhood or that the officers faced any threat that day. According to Johnson, the officers observed the Chrysler and "believed that the man standing at the door of the residence across the street was likely the driver, based on a very limited set of descriptors and by lack of other individuals visible in the surrounding area." Johnson asserts that, when O'Diam approached him, it was "most akin to a casual encounter," with the purpose of determining whether he had been the driver of the vehicle, because O'Diam "had a hunch" that Johnson had been the driver of the vehicle with the window tint violation. Johnson argues that the trial court incorrectly found that the search of Johnson was conducted incident to lawful arrest.

{¶ 41} Johnson asserts that there was no testimony that he "presented as * * * armed or dangerous in any way." He was already at the door of his residence when the cruiser pulled up, with some distance between him and the officer, and Johnson remained at the door and waited for the approaching officer. Regarding O'Diam's testimony that he was concerned that Johnson might flee, Johnson characterizes this testimony as "merely the officer's subjective impression and speculation of what he believed was in Johnson's mind" and points out that, if he had truly wanted to evade the police, he "could have done so by simply entering his family's home or by running" as soon as he saw the officer. Johnson asserts that O'Diam's testimony "exemplifies the officer's own skewed perception" of the situation on the porch.

{¶ 42} Johnson further asserts that, under the circumstances, even a pat-down

for weapons was not justified, so a "full seizure," i.e., "the act of physically grabbing [him] and restricting [his] freedom of movement entirely" also should not "pass constitutional muster." Johnson argues that the evidence showed that he remained at the front door, provided identification when asked, and was neither rude nor aggressive; thus, there was no justification for O'Diam to grab him. Johnson argues that his "natural response" of trying to pull away, to avoid being slammed onto the concrete, did not constitute obstructing official business. He also argues that "his action did not constitute an overt act" for purposes of obstructing, but rather a response to being grabbed without notice or explanation. He asserts that he did not "push or use any force towards law enforcement."

{¶ 43} Johnson also argues that he did not act with an intent to obstruct the officers; he acted with the intent to be free from an "unlawful interference." According to Johnson, he "did not even realize that there was a business to obstruct, since he was unaware of what the business was in the first place." He repeatedly requested information about what O'Diam wanted and was not told the nature of the business until after he had been pressed against the wall with his hands behind his back, at which point he fully cooperated fully.

{¶ 44} According to Johnson, the trial court erred in relying on *Thompson*, 2d Dist. Montgomery No. 26139, 2014-Ohio-4244, and *Thompson* "highlights some of the precise shortcomings of this case" in that it reasoned that there should be "a reasonable progression of how a suspect is approached." According to Johnson, because the officer never identified himself or the purpose for the stop to Johnson until after Johnson had been seized and pressed against the wall, there was no "reasonable progression" like in *Thompson*; O'Diam went from investigating the possible driver of a car with a tint violation

to a "full-blown seizure." Johnson also asserts that, unlike in *Thompson*, the restraint used in his case was not necessary and was not the least intrusive means reasonably available.

{¶ 45} Johnson directs our attention to *State v. Ewing*, 2d Dist. Montgomery No. 27456, 2017-Ohio-7194, and he asserts that that decision "makes clear that an unlawful stop at its inception cannot be cured" under circumstances such as those presented in this case. He argues that police should not be allowed to "create their own exigent circumstances or entrap people" by mishandling a situation to justify an arrest. According to Johnson, O'Diam had "every opportunity" to speak to Johnson, address the window tint violation, and inquire about Johnson's knowledge regarding the incident the previous week." Johnson asserts that the stop should have been a "conversation" that led to a possible citation for the window tint violation. According to Johnson, even if deference were given to O'Diam's concerns that Johnson might run, there was "still no need and no justification for turning this stop into a full-blown physical seizure," because Johnson had not run or tried to escape up to that point. He argues that there was no justification for O'Diam to pat him down at the outset of the encounter, and such action did not "become justified" when O'Diam "became physical" with Johnson "without cause."

{¶ 46} Finally, Johnson asserts that the State seemed to suggest that Johnson consented to a pat-down, but such a claim is undercut "by the lack of voluntariness underlying the entire interaction" and the officer's acknowledgement of Johnson's statement, in response to the question about the pat-down, that the officer already was conducting a pat-down.

{¶ 47} The State responds that O'Diam searched Johnson incident to a lawful

arrest, and that O'Diam had probable cause to believe that Johnson committed obstructing official business. According to the State, Johnson's purpose in trying to run from Officer O'Diam could "be inferred from the act and circumstances surrounding it." When O'Diam grabbed Johnson's waistband, Johnson flailed his arms, broke the officer's grip, and started to run away; Johnson almost made it to the end of the porch before O'Diam regained his hold of him. The State asserts that Johnson knew or should have known that O'Diam was a police officer -- and therefore a public official – under these circumstances.

{¶ 48} The State asserts that O'Diam had to catch Johnson before he escaped and that Johnson impeded the investigation of the tint violation. The State points out that R.C. 4513.241(C) prohibits operation of a vehicle that violates window tint regulations regardless of who owns the vehicle; because it was reasonable to suspect that Johnson was the driver of the vehicle in question, it was reasonable to detain him to investigate an R.C. 4513.241(C) violation.

{¶ 49} According to the State, it was also reasonable for the officers to suspect that Johnson was the driver when the Chrysler fled from the police a week earlier. The State acknowledges that Johnson may not have been the driver who fled from police on the prior occasion, but Officer O'Diam could nonetheless lawfully detain Johnson "long enough to dispel his suspicion." The State argues that O'Diam acted reasonably in seizing Johnson, because grabbing Johnson's waistband "was the least intrusive method available" to effect the stop and keep Johnson from fleeing. Furthermore, in O'Diam's experience, Johnson's behavior as O'Diam approached him was consistent with someone about to flee; according to the State, this, coupled with the fact that the vehicle

Johnson was driving had recently fled from police, established a need for O'Diam to physically restrain Johnson. The State asserts that "a traffic stop is a seizure," that the "limited amount of physical force here was necessary, and it was the least intrusive means available to accomplish the goal of the stop." According to the State, O'Diam "sought to prevent flight instead of allowing the situation to escalate."

{¶ 50} The State argues that Johnson "confuses the distinction between a search and a seizure," and that, while a search of Johnson's person would likely have been unlawful before O'Diam had probable cause to arrest Johnson for obstructing official business, Johnson had "no privilege to impede a lawful investigatory detention." The State notes that Johnson admitted he knew O'Diam was a police officer from his uniform and the overhead lights of his patrol car. The State also notes that the law "does not require communication before seizure," and Johnson cites no authority for his assertion to the contrary.

{¶ 51} Finally, the State asserts that Johnson's reliance upon *Ewing*, 2d Dist. Montgomery No. 27456, 2017-Ohio-7194, is misplaced, since "this is not a pat-down case," it is a case about whether O'Diam had reasonable suspicion that Johnson might flee. The State asserts that O'Diam did have a reasonable suspicion and that Johnson "confuses his subjective state of mind with an officer's objective reasonable suspicion." According to the State, in O'Diam's experience, people exhibiting behaviors like Johnson's had fled, and this "competent, credible evidence" supported a finding that O'Diam reasonably suspected that Johnson might flee. Finally, the State asserts that when O'Diam began patting Johnson down, Johnson was already under arrest for obstructing official business, so O'Diam did not need Johnson's consent to search him.

**{¶ 52}** As this Court has recently noted:

> * * * Appellate "review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. As the trier of fact, a trial court "is in the best position to weigh * * * evidence * * * and evaluate [the credibility of] witness[es]," so an "appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Graves*, 12th Dist. Clermont No. CA2015-03-022, 2015-Ohio-3936, ¶ 9, citing *State v. Cruz*, 12th Dist. Preble No. CA2013-10-008, 2014-Ohio-4280, ¶ 12. Accepting the trial court's findings of fact as true, "the appellate court must then independently determine, without deference to the [trial court's legal] conclusion[s]," whether the "facts satisfy the applicable * * * standard." *Burnside* * * * [at] ¶ 8, citing *Fanning* * * * and *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

*State v. Ivkovich*, 2018-Ohio-609, 106 N.E.3d 305, ¶ 7 (2d Dist.).

**{¶ 53}** As this Court has further indicated:

> The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution guarantee the right to be free from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Orr*, 91 Ohio St.3d 389, 391, 745 N.E.2d 1036 (2001). The law recognizes three types of police-citizen interactions: 1) a consensual encounter, 2) a brief investigatory stop or

detention, and 3) an arrest. *State v. Millerton*, 2015-Ohio-34, 26 N.E.3d 317, ¶ 20 (2d Dist.).

Consensual encounters occur when the police merely approach a person in a public place and engage the person in conversation, and the person remains free not to answer and to walk away. *State v. Lewis*, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, ¶ 21, citing *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Consensual encounters are not seizures, and the Fourth Amendment guarantees are not implicated in such an encounter. *State v. Taylor*, 106 Ohio App.3d 741, 747-749, 667 N.E.2d 60 (2d Dist.1995), citing *Mendenhall* at 554 * * *.

Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *State v. Swift*, 2d Dist. Montgomery No. 27036, 2016-Ohio-8191, ¶ 10. "An individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or [was] compelled to respond to questions." *Lewis* at ¶ 22, citing *Mendenhall* at 553 * * *, and *Terry* at 19 * * *. Fourth Amendment protections are implicated in an investigatory detention, *i.e.*, a *Terry* stop.

In determining whether an individual engaged in a consensual encounter or was subject to an investigatory detention, the focus is on the

police officer's conduct, not the subjective state of mind of the person stopped. *State v. Ramey, 2d* Dist. Montgomery No. 26705, 2016-Ohio-607, ¶ 25. As we stated in *State v. Ward*, 2017-Ohio-1391, 89 N.E.3d 124, ¶ 26 (2d Dist.):

> "A consensual encounter remains consensual even if police officers ask questions, ask to see the person's identification, or ask to search the person's belongings, provided 'the police do not convey a message that compliance with their requests is required.' " [*State v.*] *Westover,* 2014-Ohio-1959, 10 N.E.3d 211, at ¶ 15 [(10th Dist.)], quoting [*Florida v.*] *Bostick,* [501 U.S. 429, 435, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)]. In this regard, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Bostick* at 437 * * *, quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).

Whether a particular police encounter with a citizen is an investigative stop, as opposed to a consensual encounter, is fact-sensitive. *Id*. at ¶ 26; *State v. Satterwhite*, 2d Dist. Montgomery No. 15357, 1996 WL 156881, *3 (Apr. 5, 1996). "Factors that might indicate a seizure include the threatening presence of several police officers, the display of a weapon, some physical touching of the person, the use of language or tone of voice

indicating that compliance with the officer's request might be required, approaching the person in a nonpublic place, and blocking the citizen's path." *State v. Cosby*, 177 Ohio App.3d 670, 2008-Ohio-3862, 895 N.E.2d 868, ¶ 13 (2d Dist.), citing *Mendenhall.*

*State v. Weisgarber*, 2017-Ohio-8764, 88 N.E.3d 1037, ¶ 15-19 (2d Dist.).

**{¶ 54}** As this Court previously noted in *State v. Payne*, 2d Dist. Montgomery No. 13898, 1994 WL 171215, *4:

* * * It has been held that handcuffing in the course of an investigative detention does not necessarily make that detention an arrest so long as handcuffing is reasonable under the circumstances. * * * Whether handcuffing or other methods of detention are reasonable "depends on whether the restraint was temporary and lasted no longer than was necessary to effectuate the purpose of the stop, and whether the methods employed were the least intrusive means reasonably available to verify the officers' suspicions in a short period of time." * * * Such force may be used to maintain the status quo and prevent flight. * * *

**{¶ 55}** As noted above, the trial court determined that the officers had a reasonable articulable suspicion that the window tint on the vehicle was in violation of R.C. 4513.241, a minor misdemeanor. The trial court also found that the officers could detain Johnson to investigate the previous failure to comply involving the vehicle, in violation of R.C. 2921.331(B), a misdemeanor of the first degree.

**{¶ 56}** R.C. 2921.31(A) proscribes obstructing official business and provides: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the

performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties."  "In order to commit obstructing official business, an individual must commit 'an overt act done with an intent to obstruct the officers' and the act must succeed in actually hampering or impeding the officers."  *State v. Davis*, 2017-Ohio-5613, 94 N.E.3d 194, ¶ 37 (2d Dist.), citing *State v. Crawford,* 2d Dist. Montgomery No. 26722, 2016-Ohio-3484, ¶ 22.

{¶ 57} We have reviewed the video/audio of Johnson's arrest.  The interaction between Johnson and O'Diam is not visible because the cruiser camera was pointing down the street in the course of the encounter.  O'Diam can be heard twice at the start saying, "What's up man?" O'Diam then asked Johnson if he had identification.  The parties disagree over Johnson's response, but the trial court found that Johnson "initially said, 'No,' but almost immediately changed his answer to 'yes. ' "  O'Diam then asked Johnson, "Did you see a little kid come through here?"  Johnson responded, "No." Johnson asked, "What is the problem?"  O'Diam then said, "Come back to me." Johnson continued to repeatedly yell, "What is the problem?," O'Diam told Johnson to stop, and a scuffle is audible.  Johnson then twice yelled "Jarelle!," then stated, "I'm calling my son, bro."  After asking O'Diam seven times what the problem was, Johnson asked, "Then tell me what are we doing wrong?"  Thereafter, O'Diam responded, "The car ran from me, and I'm trying to talk to you, okay?   You calm down and we'll get it under control, okay?   Put your hands behind your back for me, all right?"

{¶ 58} Although the trial court determined that the matter herein was "somewhat similar" to *Thompson*, 2d Dist. Montgomery No. 26139, 2014-Ohio-4244, we conclude

that Johnson's arrest was distinguishable.   In *Thompson*, Officer Hieber observed Thompson commit "several traffic violations" before parking his vehicle and entering a cell phone store. *Id.* at ¶ 5.   Hieber approached Thompson inside the store, identified himself as a police officer, and explained "that he needed to speak with him a second about his window tint of his vehicle."   *Id.* at ¶ 6. Thompson "became very defensive," stood up and loudly exclaimed that he had done nothing wrong.   Thompson also denied that he arrived in the vehicle parked outside, claiming instead that he had arrived on foot. *Id.*   Hieber testified that he advised Thompson that he had observed him park his vehicle and again explained that he wanted to speak to Thompson about the vehicle.   *Id.* at ¶ 7. In response, Hieber testified that Thompson loudly denied wrongdoing and "continued to escalate the situation."   *Id.*   "Hieber described Thompson's behavior as 'spastic,' claiming he was 'moving his arms about,' and that he was 'totally uncooperative.' "   *Id.*

{¶ 59} When Hieber attempted to escort Thompson from the store by his elbow, Thompson refused, stating, " 'I'm not going anywhere.' "   *Id.* at ¶ 8.   In the course of a second attempt to escort Thompson out, Thompson pulled away from Hieber; Hieber "drew his taser in an effort to gain compliance and told Thompson that he was going to conduct a pat down of his person."   *Id.*   Hieber testified that he decided to conduct a pat down for his safety and for the safety of the patrons in the store, as he thought Thompson may have a weapon based on his actions and lack of cooperation.   Hieber also testified that it was cold outside and that Thompson was wearing layers of clothes in which a weapon could have been concealed.   *Id.*   In the course of an attempted pat down, after Thompson was ordered to place his hands on a wall, Thompson twice reached for his right pants pocket; Hieber then placed Thompson in handcuffs and escorted him out of

the store.   *Id.* at ¶ 9.

{¶ 60} This Court determined that Thompson was lawfully detained and that heroin found on his person was seized pursuant to a lawful pat down.   This Court noted:

> "Once a lawful stop has been made, the police may conduct a limited protective search for concealed weapons if the officers reasonably believe that the suspect may be armed or a danger to the officers or to others." (Citation omitted.)   *State v. Lawson*, 180 Ohio App.3d 516, 2009-Ohio-62, 906 N.E.2d 443, ¶ 21 (2d Dist.). " 'The purpose of this limited search is not to discover evidence of crime, but to allow the [officer to pursue his investigation without fear of] violence[.]' "   *State v. Evans*, 67 Ohio St.3d 405, 408, 618 N.E.2d 162 (1993), quoting *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).
>
> In order to justify a pat down, "the police officer must be able to point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Footnote omitted.)   "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."   (Citations [o]mitted.)   *Id. at 27.   Accord State v. Grefer,* 2d Dist. Montgomery No. 25501, 2014-Ohiio-51, ¶ 24.

*Thompson*, 2d Dist. Montgomery No. 26130, 2014-Ohio-4244, ¶ 25-26.

{¶ 61} It was significant to this Court that Thompson's actions led Hieber to believe that his safety as well as the safety of the other patrons in the store may have been in

danger. It was also significant that Thompson had lied to Hieber about driving to the store; stood up and yelled excitedly at Hieber multiple times while flailing his arms; was defensive and refused to calm down after Hieber merely asked to talk to him about his window tint; and was uncooperative when Hieber asked him to come outside the store. *Id.* at ¶ 27.

{¶ 62} In *Ewing*, 2d Dist. Montgomery No. 27456, 2017-Ohio-7194, to which Johnson directs our attention, Officers Reeb and Conrads, who were on bike patrol, observed Ewing enter and then depart five minutes later from a residence that was the subject of a complaint of drug activity. *Id.* at ¶ 4. Ewing was then observed jaywalking. *Id.* This Court noted the following facts:

Reeb stated that he and Conrads approached Ewing on their bicycles, and that Ewing "made a right hand turn to travel west on 3rd Street," and that they caught up with him there. Reeb stated that they intended "to make a stop on him for jaywalking across More Avenue." Reeb testified that he "was able to get directly behind [Ewing] before he even recognized us. I asked him to stop. I got off my bicycle and I told him the reason I stopped him was for jaywalking and then from that point I then asked him for identification. Then I told him prior to getting your wallet out * * * do you mind if I pat you down for weapons?" Reeb further testified, "I said, prior to you getting your wallet out, I said, I'm going to pat you down for weapons, so please don't reach for anything." When asked why he wanted to pat Ewing down, Reeb responded, "This is the highest drug and prostitution area on the east side of Dayton," and "with drugs, we tend to

find weapons."

Reeb stated that "when I expressed my concerns for patting him down for weapons, he immediately took a step away from me, which made me nervous. I don't know why he was trying to make separation between the two of us." At that time, Reeb stated that he "took another step towards [Ewing] and asked him again if he had any weapons on him." Reeb testified that Ewing then took another step away from him and then "he tried to turn away from me and * * * lunge like he was about to run across the street." Reeb stated that he "was then able to gain control of him. I grabbed ahold of him and took him to the ground and then Mr. Ewing was kind of refusing to put his hands behind his back." Reeb stated that he and Conrads "had to gain control of his arms and put them behind his back to place him in cuffs."

*Id.* at ¶ 5-6.

**{¶ 63}** This Court noted that Reeb "stated that he wanted to pat Ewing down for weapons due to 'where [Ewing] was coming from.' He acknowledged that Ewing did not make furtive movements as he approached him from behind, and that he did not observe any bulges about Ewing's person." *Id.* at ¶ 8. This Court noted that Reeb "acknowledged that he was in the area on a 'drugs complaint,' not a weapons complaint. Reeb stated that Ewing told him that he did not want him to touch him. Reeb stated that Ewing did not have the opportunity to run from him after he grabbed him and took him to the ground." *Id.* Ewing was arrested due to items found on his person. *Id.*

**{¶ 64}** This Court concluded that the officers' stop of Ewing was "valid' for

jaywalking, a minor misdemeanor, noting that R.C. 2935.26 provides that a citation for a minor misdemeanor must be used rather than an arrest, under appropriate circumstances. *Id.* at ¶ 42, 44. This Court noted that, although Reeb initially asked for Ewing's identification, the trial court determined that Ewing "was not given an opportunity to identify himself," since Reeb then indicated his intention to pat Ewing down before allowing him to reach into his pocket for identification. *Id.* at ¶ 44. This Court further noted that, in *State v. Sumlin*, 2d Dist. Montgomery No. 23144, 2009-Ohio-2185, ¶ 50, we "found 'that the action of simply backing away, slowly, over a short distance, from two police officers exiting a police cruiser, in a high crime neighborhood, with ones hands behind ones back, is not sufficient to give rise to a reasonable, articulable suspicion that criminal activity is afoot, as required for a stop under *Terry v. Ohio* * * *.' " *Ewing* at ¶ 45, citing *Sumlin*. We further noted that Ewing's conduct "presented no appreciable prospect of danger to the officers." *Id.* We held that, under the totality of the circumstances, Reeb "lacked an *individualized* suspicion, specific to Ewing, which suggested a threat to the officers' safety," and that the trial court "did not err in grating Ewing's motion to suppress." *Id.* at ¶ 45-46.

{¶ 65} Taking into account all of the circumstances, we initially conclude that O'Diam's encounter with Johnson was in the nature of a *Terry* stop, and not a consensual encounter. *Terry* held that " 'where a police officer observes unusual conduct which leads him reasonably to conclude that criminal activity may be afoot' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *State v. Evans*, 67 Ohio St.3d 405, 422, 1993-Ohio-186, 618 N.E.2d 162, quoting *Terry* at 30. The officer's mission during a traffic stop includes

determining whether to issue a traffic ticket, checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. "* * * [A]ddressing the infraction is the purpose of the stop * * *." *Rodriquez v. United States*, 575 U.S. 348, 135 S.Ct. 1609, 191 L.Ed. 492 (2015). Here, the only traffic violation associated with Johnson for which there was direct evidence was the window tint violation. Accordingly, the first thing to be done was to advise Johnson of the basis for the encounter.

{¶ 66} Although O'Diam was in uniform and activated his overhead lights in the course of the stop, he did not identify himself by name to Johnson or immediately state the basis for the stop. Based upon O'Diam's testimony, we conclude that asking Johnson if he had observed a small child passing by was not a "reasonable inquiry" aimed at confirming O'Diam's suspicions regarding the vehicle, but rather a ruse to close the gap between him and Johnson to allow for the unjustified, physical seizure of Johnson's person. O'Diam did not advise Johnson of the purpose of his investigation until after Johnson was forcibly seized. We cannot conclude that Johnson's looking around and fumbling with keys at the door of a home for which he possessed his own key was conclusive indicia of flight, and Johnson did not resist or obstruct in any fashion until he was unlawfully, forcibly seized by O'Diam.

{¶ 67} The trial court referred to Johnson as the "apparent driver" of the Chrysler on the day of the stop, but there was no evidence that Johnson had been driving the vehicle the week before, and O'Diam knew that the vehicle was registered to Rachel Heard. In other words, while the Chrysler was previously observed fleeing from the police, there was no direct evidence connecting the previous flight to Johnson. O'Diam's

repeated characterization of the vehicle's "propensity to flee" and his testimony that "if they're going to flee in a car, they're going to flee on foot typically," in relation to Johnson, were therefore attenuated, and Johnson's affirmative acts on the porch did not reveal any attempt to flee.

{¶ 68} In *Thompson,* Officer Hieber identified himself to Thompson at the start of their encounter and clearly explained that he was investigating the window tint of the vehicle, whereas O'Diam did not advise Johnson of the reason for the stop until after he attempted to effect a ruse about a child, after he physically restrained Johnson, and after Johnson repeatedly asked, "What is the problem?" In *Thompson,* in spite of Hieber's reasonable conduct, Thompson lied to Hieber, an overt act, and remained defiant, refusing to comply and escalating the situation. Officer Hieber was concerned about his safety and the safety of the store patrons. By contrast, O'Diam expressed concern that Johnson *might* flee. We conclude that the record herein is devoid of the requisite "overt act with an intent to obstruct the officers" to establish obstruction of business prior to Johnson's unlawful, forcible seizure. O'Diam's concern about Johnson's *potential* flight was insufficient, and Johnson did not attempt to leave the porch in the course of the encounter.[1]

{¶ 69} The trial court's finding that Johnson "believed the officers were effectuating a traffic stop" when they activated the overhead lights as the cruiser pulled next to the Chrysler along the curb is not supported by competent, credible evidence. Fifteen to twenty minutes had elapsed since the officers observed the Chrysler, and Johnson had

---

[1] We have viewed State's Exhibit 4, a photograph of the Danner Avenue residence, and the porch is small, covering the front door and one window at the front of the house.

not been pursued or been given any indication that he had violated a traffic law before he parked and exited the vehicle.

{¶ 70} We agree with Johnson that O'Diam was not permitted to create an exigency by seizing Johnson before explaining the basis for the stop. As in *Ewing*, there was no evidence that Johnson made furtive movements such as reaching into his pockets, there was no evidence that the residence was in a high crime area, or that any bulges were visible on Johnson's person suggesting the presence of weapons, and Johnson's conduct presented no appreciable danger to O'Diam and Bowling. There was no evidence that the officers recognized Johnson from prior criminal interaction. Johnson had not even stepped away or backed up from O'Diam prior to his physical restraint.

{¶ 71} Also as in *Ewing*, Johnson did not take the opportunity to run before O'Diam placed him against the wall of the residence. O'Diam testified only that Johnson moved three steps from him on the porch before O'Diam grabbed him a second time. *See State v. Lohaus*, 1st Dist. Hamilton No. C-020444, 2003-Ohio-777, ¶ 12 (defendant's actions in fleeing across several lawns after being told to stop and in forcing the investigating officer to physically restrain him fell squarely within R.C 2921.31(A)); *State v. Lewis*, 2d Dist. Montgomery No. 27152, 2017-Ohio-1195, ¶ 12 (by fleeing on foot from the scene of a lawful traffic stop and requiring the officer to pursue him into the street, defendant was subject to a valid arrest for obstructing official business).

{¶ 72} We conclude that O'Diam did not engage in the least intrusive means reasonably available to verify his suspicions and that his use of force in seizing Johnson was greater than necessary to carry out his duties; therefore, his actions were unlawful

and unreasonable. To the extent the State asserts that Johnson did not cooperate, we conclude that Johnson was not given an opportunity to cooperate. Significantly, O'Diam testified that he was able to "pick up [Johnson's] body weight," acknowledged that he forced Johnson's body against the wall of the house before explaining the reason for the stop, and testified that he "wanted to get his hands on him first" before explaining the reason for the stop. It is evident that Johnson carried identification, since it was ultimately provided, and O'Diam should have given him the opportunity to produce it before forcefully seizing him. O'Diam testified that Johnson was not rude nor hostile.

{¶ 73} We conclude that excessive force was used in the context of this investigatory stop of a free citizen, invoking the protections of the Fourth Amendment, which guarantees citizens the right to be secure in their persons against unreasonable seizures of the person. This requires that the use of force be objectively reasonable, balancing the cost to the individual against the government's interest in effecting a seizure. There is a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case. This includes the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. A window tint violation is a minor misdemeanor; there was no direct evidence that Johnson was the driver at the time of the previous failure to comply, there was no evidence that Johnson posed a threat to the officers or others, and Johnson did not resist until he was forcefully seized without explanation. While the goal of an officer's safety and investigatory duties may be in tension with an individual's right to be free from unwarranted/unlawful physical seizure of one's person, they can

coexist; indeed the Ohio and U.S. Constitutions mandate it. It is not obstructive, nor is it attempted flight, to simply look around.

{¶ 74} We conclude that, in light of all the surrounding circumstances, the trial court erred in overruling Johnson's motion to suppress, because no overt act of obstruction or attempted flight preceded O'Diam's use of unreasonable force. Johnson's arrest was unlawful.

{¶ 75} Johnson's assignment of error is sustained. The judgment of the trial court is reversed, and the matter will be remanded for further proceedings.

. . . . . . . . . . . .

TUCKER, P.J., concurs:

{¶ 76} I agree with the conclusion that the heroin and fentanyl discovered during O'Diam's custodial search of Johnson should have been suppressed. I write separately to state that I reach this conclusion because O'Diam did not have probable cause to arrest Johnson for obstructing official business.

{¶ 77} When probable cause exists that a person has committed or is committing a criminal offense, the Fourth Amendment allows the person to be arrested in a public place without a warrant. *State v. Anderson*, 2d Dist. Clark No. 2009-CA-60, 2011-Ohio-22, ¶ 20, citing *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 413, ¶ 66, citing *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). But a warrantless arrest made without probable cause violates the Fourth Amendment, triggering the exclusionary rule. *Anderson* at ¶ 22, citing *Wong Sun v. United States*,

371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

{¶ 78} This court has described probable cause as follows:

Probable cause to arrest depends "upon whether, at the moment the arrest was made * * * the facts and circumstances within [the arresting officer's] knowledge and of which [he] had reasonably trustworthy information, were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense."

*State v. VanNoy*, 188 Ohio App.3d 89, 2010-Ohio-2845, 934 N.E.2d 413, ¶ 22 (2d Dist.), quoting *Adams v. Williams*, 407 U.S. 143, 148, 92 S.Ct. 192, 32 L.Ed.2d 612 (1972), citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

{¶ 79} R.C. 2931.31(A) defines the offense of obstructing official business as follows:

No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

Thus, the overarching issue is whether, under the totality of the circumstances, O'Diam, at the moment of the arrest and acting as a reasonable, prudent police officer, had probable cause to believe that Johnson's actions were taken with the "purpose to prevent, obstruct, or delay" the performance of an authorized act (the traffic and investigative stop), and that Johnson's actions did hamper or impede the execution of the stop.

{¶ 80} As he approached Johnson, O'Diam did not inform Johnson that he was

being stopped for the window tint violation and to investigate the vehicle's involvement in the previous failure to comply with an attempted traffic stop. Instead, O'Diam asked Johnson "what's up," inquired if Johnson had identification, and asked Johnson if he had "seen a kid in the area." Upon reaching Johnson, and without informing him that a stop was occurring, O'Diam grabbed Johnson's waistband. In response, Johnson struggled "to get away from [O'Diam]," but O'Diam, while ordering Johnson to stop the struggle, was able to "force [Johnson] against the wall of the house." O'Diam then asked Johnson to place his hands behind his back. Johnson complied and, at this point, O'Diam explained the reason for the stop and secured Johnson with handcuffs. O'Diam testified that Johnson was placed in handcuffs because "at that point, he was under arrest for obstruction." O'Diam further testified that the arrest was made because he had "told [Johnson] to stop * * * [Johnson] was able to push his arm back off of me to gain distance, and he * * * [tried] to run away." O'Diam also testified that Johnson's struggle impeded O'Diam's ability to investigate the tint violation and the previous failure to comply.

{¶ 81} When he was grabbed, Johnson had no reason to believe that O'Diam was executing a traffic and investigative stop. From Johnson's perspective, all that had occurred was O'Diam's attempt to initiate a consensual encounter. Again, from Johnson's viewpoint, he had the right to engage, or not, in the attempted consensual encounter. Further, based upon the limited information he had conveyed to Johnson, O'Diam knew that when Johnson was placed in restraints, he had no reason to know that an official act, the traffic and investigative stop, was occurring. Upon being grabbed, Johnson did attempt to escape O'Diam's grasp, and while being told to stop, he was pushed against the house, at which point he became compliant.

{¶ 82} The precise question, given this sequence of events, is whether Johnson's continued, although brief, struggle upon being commanded to stop provided O'Diam with probable cause to arrest Johnson for obstructing official business. I conclude, under the unique facts of this case, there was not probable cause to believe that Johnson's continued struggle occurred with the purpose to "prevent, obstruct, or delay" O'Diam's performance of an "authorized act within [his] official capacity." An officer engaged in an attempted consensual encounter (which, again, from Johnson's perspective, was all that was occurring) acts outside his official capacity by physically restraining the citizen involved in the attempted encounter. Thus, since O'Diam chose not to inform Johnson he was the subject of an authorized act, O'Diam could not, at the moment of arrest, have reasonably believed Johnson's struggle occurred with the purpose to interfere with a traffic or investigative stop. Based upon the lack of probable cause to arrest, I concur in the majority opinion.

WELBAUM, J., dissents:

{¶ 83} I respectfully disagree with the majority's conclusion that the police officers did not have a reasonable basis to stop Johnson and probable cause to arrest him for obstruction of justice. For the following reasons, I would affirm the judgement of the trial court.

{¶ 84} As an initial point, because the encounter was a *Terry* stop, the officers needed a reasonable articulable suspicion that Johnson had engaged in illegal activity. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In my view, this standard was clearly met.

{¶ 85} Shortly before the stop, the officers noticed a window tint violation on the side windows of the vehicle in question; when they ran the vehicle's license plates, they also learned that the driver of the vehicle had fled from police officers during an attempted traffic stop a week earlier. As a result, the officers had reasonable, articulable suspicion to investigate two issues: the prior failure to comply and the tint violation.

{¶ 86} On the occasion at issue in this case, the officers were unable to immediately effectuate a traffic stop when they saw the tint violation because of traffic and their concern about the vehicle's "propensity to flee," based on the prior history. However, after the car and the cruiser passed in opposite directions, the officers continued to look for it, including in the nearby area where the flight from officers previously occurred. About ten to fifteen minutes after the officers initially observed the car, they found it parked on Danner Avenue. Based on the license plate, they were able to confirm that this was the same vehicle they had seen earlier that day.

{¶ 87} In addition, Officer Bowling saw the car's driver (Johnson) on the porch of a house located across the street from the parked car. Bowling recognized Johnson as the driver because the front windshield of the suspect vehicle was not tinted, and he was able to view both occupants when the cruiser faced the vehicle. The trial court did note that the evidence that Johnson had been involved in the failure to comply a week earlier was "not quite as strong" as the evidence of the tint violation, since someone else could have been driving the car on the prior occasion. However, the officers only needed one reasonable basis for the stop, and they clearly had it due to the window tint violation.

{¶ 88} As the officers pulled up with their lights activated, Johnson was "fumbling * * * [with] his keys" at the door to the house, looking up and down the street, seemingly

"indecisive." Based on Officer Bowling's certainty that the man on the porch had been the driver of the vehicle and on Johnson's proximity to the car, it was "obvious" to Officer O'Diam that Johnson had been the driver. Johnson's furtive behavior also reinforced the concern that he might attempt to flee. Due to O'Diam's very reasonable suspicions that Johnson had just been driving, that Johnson had exited a vehicle with a window tint violation, and that the vehicle had previously been involved in flight from the police, O'Diam had reasonable articulable suspicion to initiate a stop.

{¶ 89} In my view, the majority unduly minimizes Officer O'Diam's reasonable perception that Johnson was a likely flight risk. First, the car in question had an undisputed history of fleeing during an encounter initiated by the police. While no direct evidence indicated that Johnson had been the driver previously, this was still a factor the officers could reasonably weigh in the totality of the circumstances, along with Johnson's apparent nervousness and scanning of his surroundings as O'Diam approached.

{¶ 90} Furthermore, the majority places undue emphasis on the trial court's statement in its conclusions of law that the officers "felt" Johnson was the driver they had seen earlier, seeming to suggest that the officers were not sufficiently certain to justify the stop. Contrary to this suggestion, the officers' testimony clearly indicated that they had no question that Johnson was the driver of the car they had been looking for, based on Johnson's physical appearance (which Officer Bowling had observed minutes earlier), his proximity to the car, and the absence of anyone else in the vicinity. The trial court credited the officers' testimony.

{¶ 91} I agree that O'Diam did ask Johnson some initial questions as he (O'Diam) approached the porch, and that the questions were an admitted attempt to engage

Johnson and prevent him from entering the house. Nonetheless, while the questions did not directly relate to the suspected offenses, they did not undercut the reasonableness of O'Diam's actions in approaching Johnson.

{¶ 92} Similarly, while I agree with the majority that Johnson's "fumbling" with his keys and nervous behavior on the porch were not "conclusive indicia of flight," conclusive evidence that criminal behavior is afoot is not the standard. O'Diam was an experienced police officer, and these behaviors were a reasonable part of his assessment of the totality of the circumstances with which he was confronted. As noted, O'Diam's assessment that Johnson posed a flight risk was reasonable.

{¶ 93} The majority opinion also concludes that O'Diam used "excessive force" during the investigatory stop of Johnson, that there was "no overt act of obstruction" of justice prior to the unreasonable use of force, and that the evidence found as a result of Johnson's arrest therefore should have been suppressed. To the contrary, the trial court concluded that O'Diam's use of force (grabbing Johnson's waistband) was reasonable under the circumstances, which included O'Diam's assessment that Johnson was considering flight, and the information that the vehicle Johnson had been driving had been involving in fleeing from the police a week earlier. Again, I agree with the trial court.

{¶ 94} As the trial court noted, Johnson's resistance to O'Diam's touching his waistband indicated that he may have been dangerous, and, therefore, handcuffing Johnson was reasonable and permissible to effectuate the purpose of the stop. In addition, this was also the least intrusive means available to quickly conclude the purpose of the stop. Once Johnson began flailing his arms, attempting to flee, acting disorderly, and obstructing while handcuffed (throwing his keys to another person), O'Diam had

probable cause to arrest Johnson for obstruction of justice. *See State v. Johnson*, 2017-Ohio-5527, 92 N.E.3d 1256, ¶ 33 (10th Dist.) ("fleeing from a police officer who is lawfully attempting to detain a suspect under the authority of *Terry* is an affirmative act that hinders or impedes the officer in the performance of the officer's duties"). As such, the search incident to that arrest was lawful. Whether sufficient evidence existed to convict Johnson of obstruction is irrelevant in this analysis.

**{¶ 95}** Contrary to standard for stops, Johnson's testimony at the suppression hearing and arguments on appeal significantly rely on his alleged mental state and perception of the events as they unfolded. Likewise, the majority and concurring opinions unduly emphasize how Johnson perceived the situation (i.e., he allegedly did not know O'Diam was pursuing a traffic stop or official business and only struggled to prevent being slammed on the concrete). These opinions suggest that Johnson could have assumed that O'Diam was attempting to initiate a consensual encounter. However, even assuming arguendo that Johnson could have reasonably believed that a consensual encounter was occurring when the officers arrived with the lights of their cruiser activated, the evaluation of whether an encounter is investigatory or consensual " 'focus[es] on the police officer's conduct, not the subjective state of mind of the person stopped.' " *State v. Ramey*, 2d Dist. Montgomery No. 26705, 2016-Ohio-607, ¶ 25, quoting *Satterwhite*, 2d Dist. Montgomery No. 15357, 1996 WL 156881, *3 (Apr. 5, 1996).

**{¶ 96}** Moreover, "[p]robable cause to arrest exists when there are facts and circumstances within the police officer's knowledge that are sufficient to warrant a reasonable belief that the suspect is committing or has committed a crime." *State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-2470, 3 N.E.3d 135, ¶ 26. " ' "Whether probable

cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." ' " *City of Columbus v. Beasley*, 2019-Ohio-719, 132 N.E.3d 1201, ¶ 45 (10th Dist.), quoting *State v. Perkins*, 10th Dist. Franklin No. 07AP-924, 2008-Ohio-5060, ¶ 25. (Other citation omitted.) *See also State v. Simmons*, 2019-Ohio-559, 132 N.E.3d 204, ¶ 14 (10th Dist.), quoting *Miller v. Sanilac Cty.*, 606 F.3d 240, 248 (6th Cir.2010) (" ' "An officer has probable cause to arrest when the facts and circumstances known to the officer warrant a prudent person in believing that an offense has been committed." ' ").

{¶ 97} Thus, even if one credits Johnson's claims that he was flailing his arms and stepping away from O'Diam out of confusion over the officer's intent or prevention of harm, the trial court's proper focus was on Officer O'Diam's perception of Johnson's actions, not Johnson's justification or mental process. Furthermore, I am unconvinced that any alleged confusion Johnson experienced about what was happening when Officer O'Diam approached him would mitigate against a finding of probable cause from the facts known by the officer. O'Diam knew that Johnson struggled with and attempted to step away from him while he was attempting to investigate Johnson. In addition, before the search incident to arrest, Johnson tossed the keys to a third person who ran by and, therefore, refreshed the probable cause for the crime of obstructing official business.

{¶ 98} In this context, I disagree with the majority's suggestion that "mov[ing] three steps [away] from" O'Diam on the porch, while struggling with him, did not amount to obstruction of justice. Again, this is an improper analysis in a Fourth Amendment context. Instead, this is an issue pertaining to the ultimate determination of guilt or innocence rather than probable cause, which the only issue before us. This suggestion

also ignores that fact that Johnson tossed the keys to a third person who ran past prior to the search.

{¶ 99} To support its conclusion, the majority cites two cases in which a defendant was able to move further away from officers before being arrested for obstruction. However, neither these cases nor the statute defining the offense of obstructing official business creates a requirement of flight of a particular distance – or any flight at all – to commit the offense. *See Lohaus*, 1st Dist. Hamilton No. C-020444, 2003-Ohio-777, ¶ 12; *State v. Lewis*, 2d Dist. Montgomery No. 27152, 2017-Ohio-1195, ¶ 12; R.C. 2921.31(A).

{¶ 100} Perhaps reasonable minds could disagree about whether the length and nature of Johnson's struggle with O'Diam in this case was done with a purpose to obstruct official business, but this is a fact-based determination relating ultimately to guilt or innocence, not to probable cause. In any event, such a determination was properly within the purview of the trial court as the finder of fact. The trial court clearly did not find Johnson credible, and its factual determination of Johnson's intent (which is irrelevant as to probable cause in any event) should be given great deference. *State v. Bryson*, 142 Ohio App.3d 397, 401, 755 N.E.2d 964 (8th Dist.2001); *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

{¶ 101} Finally, in order to invalidate the search incident to arrest here, the trial court would have had to first determine that Officer O'Diam acted in bad faith. In analyzing this issue we have said that:

> The traffic stop itself was lawful based on [the police officer's]
> observation of apparent traffic violations. Even if [the officer]
> impermissibly attempted a pat down as part of the stop, [the defendant] was

not entitled to respond by fleeing on foot and forcing the officer to chase him into the street. Although an unlawful pat down may have resulted in exclusion of any evidence discovered, " 'absent bad faith on the part of a law enforcement officer, [a defendant] cannot obstruct the officer in the discharge of his duty, whether or not the officer's actions are lawful under the circumstances.' " *State v. Burns*, 2d Dist. Montgomery No. 22674, 2010-Ohio-2831, ¶ 19, quoting *State v. Stevens*, 5th Dist. Morgan No. 07-CA-0004, 2008-Ohio-6027, ¶ 37, and *State v. Pembaur*, 9 Ohio St.3d 136, 138, 459 N.E.2d 217 (1984). We see no evidence of bad faith by [the officer].

*State v. Lewis*, 2d Dist. Montgomery No. 27152, 2017-Ohio-1195, ¶ 12.

{¶ 102} Here, there is no suggestion of bad faith on the part of Officer O'Diam. The trial court assessed the credibility of the witnesses and found the officer's actions lawful and reasonable under the circumstances. Because the trial court was correct, I would affirm.

Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
Andrea Dewar Oladi
Hon. Timothy N. O'Connell