[Cite as *State v. Goodpasture*, 2023-Ohio-4060.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellant | : | C.A. No. 29743 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 3069 |
| | : | |
| MICHAEL JAMES GOODPASTURE | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on November 9, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellant

JOHN C. CUNNINGHAM, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Appellant the State of Ohio appeals from a decision of the Montgomery County Common Pleas Court which sustained appellee Michael James Goodpasture's motion to suppress. For the following reasons, the judgment of the trial court will be reversed, and the case will be remanded to the trial court for further proceedings.

**I. Procedural History and Facts**

{¶ 2} Goodpasture was indicted on November 18, 2022, by a Montgomery County grand jury on one count of having a weapon while under disability (prior offense of violence), in violation of R.C. 2923.13(A)(2), a felony of the third degree; one count of having a weapon while under disability (prior drug conviction), in violation of R.C. 2923.13(A)(3), a felony of the third degree; and one count of improper handling of a firearm in a motor vehicle (loaded/no license), in violation of R.C. 2923.16(B), a felony of the fourth degree.

{¶ 3} On January 23, 2023, Goodpasture filed a motion to suppress evidence obtained from a warrantless search and seizure, including statements made in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A hearing on the motion was held on February 3, 2023. Prior to presenting evidence at the hearing, Goodpasture narrowed the motion to challenge only the warrantless seizure and not the alleged *Miranda* violation.

{¶ 4} At the hearing, the State presented the testimony of Officer Riley Brown, a police officer with the City of Dayton for approximately four years, along with a video recording from Officer Brown's police cruiser and body camera footage from the officer who *Mirandized* Goodpasture. Officer Brown testified that on July 1, 2022, he was driving a marked cruiser and wearing his police-issued uniform. Shortly after midnight, Officer Brown and his partner, Officer John Rice, were in the area of Nassau Street and Clover Street in the City of Dayton.

{¶ 5} Officer Brown saw a white Chevy Malibu driving toward their police cruiser when it quickly pulled to the curb and parked. He saw the driver, later identified as

Goodpasture, get out of the car and walk away from the police cruiser while repeatedly looking back at the cruiser and then at the ground. It appeared to Officer Brown that Goodpasture was attempting to put a distance between himself and the officers. Goodpasture was the only occupant of the vehicle.

{¶ 6} Officer Brown stated that when he drove by Goodpasture's car after Goodpasture had already gotten out, he could tell, based on his training and experience, that the window tint was excessive. Officer Brown explained that the legal limit for window tint in Ohio is 50 percent, but Goodpasture's car was measured to have an illegal 5 percent window tint.

{¶ 7} Officer Brown saw Goodpasture turn down an alley, so the officers followed him. When Goodpasture turned into a backyard where there were several vacant garages, the officers lost sight of him. The officers then circled back around the block to where Goodpasture had left his car.

{¶ 8} Officer Brown approached Goodpasture's parked car to look through the window. At that time, it was approximately 12:25 a.m. and dark outside. However, using his flashlight, Officer Brown was able to see a purple handgun sitting on the center console armrest. After observing the gun, the officers drove back into the alley to locate Goodpasture but were unsuccessful. The officers returned to the street and saw Goodpasture coming out of the front of a house and walking toward his car. The officers made a U-turn and stopped Goodpasture.

{¶ 9} Upon stopping Goodpasture, Officer Rice obtained his information and learned that Goodpasture was a convicted felon, meaning that he was prohibited from

possessing a firearm. Goodpasture claimed that the firearm and the car belonged to his fiancée. His fiancée came outside during the investigation, but Officer Brown did not speak with her.

{¶ 10} Goodpasture testified in his own defense. Goodpasture stated that he was 40 years old and had lived in Dayton all his life. He explained that he worked from home doing storage auctions and some tattoo work. On July 1, 2022, he had just finished packing his truck and his fiancée's car because they planned to go to the Dixie Strip Flea Market that weekend. He parked his fiancé's car near the corner of Nassau on Clover Street behind his house.

{¶ 11} After stepping out of the car, he saw the police cruiser stop at the stop sign and then go through the intersection. He noticed that it slowed down as it drove past, but the officers did not stop him or indicate there was any problem. He walked to the back of his house and through his yard to go into the house. When he got inside, he told his fiancée that two cops had gone by but informed her there was nothing wrong. His fiancée told him that she would go out to her car and his truck and lock them up.

{¶ 12} After about five minutes inside the house, Goodpasture went back outside through the front of his house to make sure the truck was locked up; the officers sped around the corner with their lights on. Goodpasture testified that he put his hands up and the officers immediately handcuffed him.

{¶ 13} Goodpasture stated that the firearm was not in the vehicle while he was in it, implying that his fiancée had put it in there after he got out of the car. According to Goodpasture, the firearm belonged to his fiancée, who had a concealed carry permit. He

further stated that the window tint on his fiancée's car was a "negative five tint" and that there would have been "no way [to see anything] with any kind of flashlight" inside the car due to the significant window tint.   Tr. 47.

{¶ 14} The trial court sustained Goodpasture's motion to suppress on March 7, 2023, based on the following findings of fact:

On July 1, 2022, Mr. Goodpasture, an adult male, was driving a vehicle and parked it on a public street.   Police officers observed him exit the vehicle and followed him because they believed he was acting "suspiciously."   Subsequently, the police used a flashlight to illuminate into the vehicle Goodpasture had been driving and saw "in plain view," a firearm (handgun) lying on the front seat of the vehicle.   Based on seeing the handgun, the officers decided to stop and detain Mr. Goodpasture to determine if he was legally carrying a handgun.

*The Court specifically finds as a matter of fact that even though the officers testified that the vehicle had tinted windows, the reason the officers stopped and detained Mr. Goodpasture was the observation, when using a flashlight to look into the vehicle, of a handgun on the front seat of the vehicle.*   No evidence was presented that the police officers had reason to believe that Mr. Goodpasture was not a "qualifying adult" or that the handgun was a "restricted firearm."

(Emphasis added.) Decision Sustaining Defendant's Motion to Suppress, p. 1-2.

{¶ 15} In sustaining Goodpasture's motion, the trial court found that as a result of

the enactment of R.C. 2923.111, Ohio's constitutional carry law that came into effect on June 13, 2022, coupled with the "Second Amendment posture of the regulation of firearms after *New York State Rifle & Pistol Assn., Inc. v. Bruen*," 597 U.S. __, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022), the trial court could not find that the officers had reasonable articulable suspicion to detain Goodpasture based merely on the presence of a handgun observed in a parked motor vehicle. The State filed a timely notice of appeal pursuant to R.C. 2945.67(A) and Crim.R. 12(K).

## II.    Reasonable Suspicion

{¶ 16} The State's sole assignment of error states that:

Notwithstanding the perceived pretextual nature of their actions, the officers had reasonable articulable suspicion of criminal activity sufficient to justify Goodpasture's investigatory detention. The trial court erred, therefore, in sustaining Goodpasture's motion to suppress.

{¶ 17} Under this assignment of error, the State contends that the trial court erred in refusing to consider that the window tint violation provided the officers with reasonable articulable suspicion to lawfully detain Goodpasture. The State points to several statements made by the trial court during the motion to suppress hearing as demonstrating the trial court's refusal to consider the window tint violation, including:

- "the legal question * * * [is] not the tint * * * [j]ust the weapon." Tr. 46.

- "To my analysis, tint doesn't matter. * * * I'll give you the tint. Doesn't matter." *Id*. at 47.

- "[The State] can argue that [Goodpasture could be detained for the

window tint violation], but I'm throwing it out. * * * I'm only looking at – I'm only looking at what I think are the guts of the case, which is the weapon." *Id.* at 55.

{¶ 18} Goodpasture, on the other hand, contends that the trial court's decision was supported by competent, credible evidence and, therefore, the trial court did not err in determining that the basis for the stop was for the firearm, not the window tint violation, such that the officers lacked reasonable articulable suspicion to detain him.

### a. Standard of Review

{¶ 19} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. * * * Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citations omitted.) *Id.*

### b. *Terry* Stops

{¶ 20} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee the right to be free from unreasonable searches and seizures." *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7, citing *State v. Orr*, 91 Ohio St.3d 389, 391, 745 N.E.2d 1036 (2001).

Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot, including a minor traffic violation." (Citations omitted.) *State v. Davenport*, 2017-Ohio-688, 85 N.E.3d 443, ¶ 16 (2d Dist.).

{¶ 21} "The propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances." *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980), paragraph one of the syllabus. "[T]hese circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." (Citations omitted.) *State v. Andrews* 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991).

{¶ 22} In determining whether a traffic stop violates the Fourth Amendment, a reviewing court must consider the objective assessment of a police officer's actions in light of the facts and circumstances then known to the officer at the time of the stop, and not the officer's subjective state of mind. *Dayton v. Erickson*, 76 Ohio St.3d 3, 6, 665 N.E.2d 1091 (1996). Accordingly, "where a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity." *Id.* at 11.

### c. Analysis

{¶ 23} There is no dispute that Goodpasture had been observed by the officers

driving the white Chevy and that the car's windows were unlawfully tinted. The question here is whether the trial court should have considered the window tint violation as a lawful basis for detaining Goodpasture, or whether the trial court could refuse to consider that evidence if the primary reason for the detention was the concern over seeing the handgun inside the vehicle. We conclude that the trial court should have considered the window tint violation as a lawful basis for the stop.

{¶ 24} "We have repeatedly held that a traffic stop for a suspected window-tint violation is lawful." *Davenport*, 2017-Ohio-688, 85 N.E.3d 443, at ¶ 18. Officer Brown testified that he was unable to discern the window tint violation due to the darkness until after the officers drove by Goodpasture's car and Goodpasture had already exited the vehicle. Upon exiting, the officers observed Goodpasture rubbernecking back toward them as he distanced himself from the officers. Although the officers attempted to locate Goodpasture by driving through the back alley, they were unable to locate him and returned to Goodpasture's vehicle. When the officers walked up to Goodpasture's car and looked inside with a flashlight, they saw a handgun in plain view. Notably, there was nothing unlawful about the officers using a flashlight to look inside the parked car, and the trial court acknowledged as much during the motion to suppress hearing. *See State v. Brown*, 2d Dist. Montgomery No. 28153, 2019-Ohio-3684, ¶ 8 ("an officer's use of a flashlight to better illuminate a vehicle's interior does not convert the officer's action into a search implicating the Fourth Amendment"). The fact that the officers became more concerned about the firearm inside the vehicle than the window tint violation did not detract from the fact that the officers had an objectively lawful basis to stop Goodpasture.

*Erickson* at 11.

{¶ 25} Goodpasture directs our attention to *State v. Johnson*, 2020-Ohio-2742, 154 N.E.3d 387 (2d Dist.), claiming that the officers should have informed Goodpasture of the reason for the stop rather than immediately seizing him. According to Goodpasture, the officers' failure to do so supported the trial court's finding that the purpose for the detention was only for the firearm and not for the window tint violation.

{¶ 26} In *Johnson*, Dayton Police Officer Zachary O'Diam testified that, while on routine patrol, he and his partner observed a black Chrysler 300 with excessively tinted windows. *Id.* at ¶ 3. O'Diam explained that one week earlier he had seen the same vehicle, which he had tried to stop for a window tint violation, but it fled from his attempted traffic stop. On cross-examination, O'Diam admitted that he knew the vehicle was registered to a female. *Id.* at ¶ 13. Because the officers were driving in the opposite direction of the Chrysler, they were able to see that the driver was a "tall skinny black male." However, due to the circumstances, O'Diam was not in a position to turn around and chase after the Chrysler at that time, so the officers drove around for the next 15-20 minutes looking for the car. *Id.* at ¶ 3-4.

{¶ 27} Officer O'Diam then saw the Chrysler parked against the curb on Danner Avenue. As O'Diam pulled up to the car, he turned on his overhead lights to initiate a traffic stop. However, there was no driver inside the vehicle, and the passenger directed O'Diam's attention to a house across the street where Johnson was standing on the front porch. *Id.* at ¶ 5. As O'Diam approached Johnson, who matched the description of the driver, he initially asked Johnson if he had any identification and then attempted to distract

him by asking Johnson if he had seen a kid in the area. Officer O'Diam explained that he was trying to close the distance between himself and Johnson so that he could grab ahold of Johnson and prevent him from fleeing, considering that the Chrysler had fled from him the week earlier. *Id.* at ¶ 5-6. O'Diam was able to grab Johnson, but Johnson tried to get away and was able to break free of his grasp. O'Diam again grabbed Johnson and was able to detain him by forcing Johnson's body against the house. *Id.* at ¶ 8. Johnson was then arrested for obstruction of official business. *Id.* at ¶ 9. A search incident to arrest revealed a baggie of heroin, which led to the charge in the indictment. *Id.* at ¶ 11.

**{¶ 28}** The question at issue in *Johnson* was whether the officer's use of force in detaining Johnson for obstructing official business was lawful. *Id.* at ¶ 39. A divided court concluded that Officer O'Diam "did not engage in the least intrusive means reasonably available to verify his suspicion and that his use of force in seizing Johnson was greater than necessary to carry out his duties; therefore, his actions were unlawful and unreasonable." *Id.* at ¶ 72.

**{¶ 29}** In reaching that conclusion, we determined that Officer O'Diam's encounter with Johnson had been a *Terry* stop for the window tint violation. *Id.* at ¶ 65. However, the window tint violation was only a minor misdemeanor, not an arrestable offense, and there was no direct evidence that Johnson had been involved in the prior failure to comply, nor was there any evidence to indicate Johnson was armed or a threat to the officers; as such, the officers' use of force to seize Johnson was unreasonable. *Id.* at ¶ 73. Since Johnson had committed no overt act of obstruction or attempted flight prior to the officer's

use of unreasonable force, Johnson's arrest for obstruction was unlawful, and the trial court should have sustained his motion to suppress. *Id.* at ¶ 73-74.

{¶ 30} The issue in *Johnson* was not whether the officers had a lawful basis to stop Johnson, but rather whether excessive force was used to detain him, which led to an unlawful arrest. We did not conclude that Officer O'Diam did not have reasonable articulable suspicion to stop Johnson for the window tint violation. Rather, we focused on the fact that O'Diam "did not engage in the least intrusive means reasonably available to verify his suspicions and that his use of force in seizing Johnson was greater than necessary to carry out his duties[.]" *Id.* at ¶ 72. In this case, the only issue raised by Goodpasture at the motion to suppress hearing was whether the officers had reasonable articulable suspicion to stop him. Because there was an objectively reasonable basis to lawfully stop Goodpasture for the window tint violation, his motion to suppress should have been overruled.

{¶ 31} During the hearing, the trial court acknowledged that there was a window tint violation but refused to consider that as part of the legal analysis. Trial courts should not ignore the evidence presented when conducting a legal analysis, particularly when the parties do not dispute the evidence. Here, both Officer Brown and Goodpasture testified that the officers saw Goodpasture driving the white Chevy and, further, that the tint on the vehicle was excessively dark. The cruiser video also reflected that the officers measured the level of tint and verified it was illegal. Accordingly, the trial court erred in sustaining Goodpasture's motion to suppress, as there had been reasonable articulable suspicion to lawfully detain Goodpasture.

**{¶ 32}** We note that the State does not argue on appeal that the trial court's ruling addressing the effect that Ohio's "constitutional carry" law and the United States Supreme Court's *Bruen* case, 597 U.S. __, 142 S.Ct. 2111, 213 L.Ed.2d 387, had on R.C. 2923.16(B) was made in error. Because that issue is not before this Court, we need not consider it and make no determinations about the correctness of the trial court's analysis. However, because the window tint violation provided sufficient reasonable articulable suspicion to conduct a lawful detention, we sustain the State's sole assignment of error.

### III. Conclusion

**{¶ 33}** Having sustained the State's sole assignment of error, we reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

. . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.